**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RAYMOND VAUGHT,
              *Plaintiff-Appellant,*

v.

SCOTTSDALE HEALTHCARE
CORPORATION HEALTH PLAN,
              *Defendant-Appellee.*

No. 06-15507

D.C. No.
CV-05-00718-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
January 15, 2008—San Francisco, California

Filed September 29, 2008

Before: William A. Fletcher, Carlos T. Bea, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Bea

13847

**COUNSEL**

Randolph G. Bachrach, Phoenix, Arizona, for the plaintiff-appellant.

Lawrence J. Rosenfeld, Greenberg Traurig, LLP, Phoenix, Arizona, for the defendant-appellee.

**OPINION**

IKUTA, Circuit Judge:

Plaintiff-appellant Raymond Vaught appeals the district court's grant of summary judgment in favor of defendant-appellee Scottsdale Healthcare Corp. Health Plan (the Plan), Vaught's health plan. The Plan is governed by the Employee Retirement Income Security Act of 1974 (ERISA). After denying Vaught's claim for benefits, the Plan declined to grant Vaught's requests for internal review of that denial. Vaught then challenged the Plan's denial of benefits in district court based on a new theory. Because Vaught had not previously raised this theory to the Plan in his requests for internal review, the district court held that Vaught had failed to exhaust his administrative remedies. The district court granted the Plan's motion for summary judgment and dismissed Vaught's ERISA claim.

On appeal, we must consider whether Vaught effectively exhausted his administrative remedies, and, if not, whether he was excused from such exhaustion. We must also consider whether ERISA claimants are subject to an issue-exhaustion requirement. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand for further proceedings.

I

Raymond Vaught was injured when his motorcycle collided with an automobile on July 26, 2003. The police report from the accident stated that, "pending the outcome of the blood results from the Scottsdale Police Laboratory, Vaught will be charged via long form for driving under the influence of alcohol." The results from the blood tests (taken at the hospital after the accident) revealed that Vaught's blood alcohol content was .2618 percent, which is more than three times

Arizona's legal limit for an individual operating a motor vehicle.

Vaught sought reimbursement of his accident-related medical costs from the Plan, a health plan established by Vaught's wife's employer, Scottsdale Health Care Corporation. This health plan is deemed to be an "employee benefit plan," as defined in ERISA, 29 U.S.C. § 1002(3). As such, it is governed by ERISA, which sets minimum substantive and procedural requirements for employee benefit plans. *Id.* § 1003(a). Under ERISA, the Plan is a separate legal entity that can sue and be sued. *Id.* § 1132(d)(1). A private company that elects to establish such a plan is referred to as the "plan sponsor." *Id.* § 1002(16)(B). The fiduciary responsible for administering such a plan is referred to as the plan "administrator." *Id.* § 1002(16)(A). Here, Scottsdale Health Care Corporation is both the plan sponsor and the plan administrator. Scottsdale Health Care Corporation retained Professional Benefit Services (PBS) to serve as the claims administrator for the Plan.

Kathy Vaught, Raymond Vaught's wife and primary beneficiary of the Plan, received an explanation of benefits (EOB) from PBS on August 15, 2003. The EOB denied Raymond Vaught's claim, stating: "INJURY DETAILS NEEDED: MUST INCLUDE HOW, WHEN & WHERE INJURY OCCURRED." In response, Kathy Vaught sent the claims administrator a copy of the police report indicating that her husband would be charged for driving under the influence of alcohol. A second EOB followed, again denying Raymond Vaught's claim and directing him to "REFER TO THE BENEFITS BOOKLET UNDER EXCLUSIONS AND WHAT THE PLAN DOES NOT COVER REGARDING MOTOR VEHICLE RELATED CHARGES."

The reverse side of this EOB stated that the EOB "is an initial determination of your claim." It informed the claimant: you "may request a copy of the documents governing the Plan and any internal rule, guideline or protocol used in the deter-

mination of your claim." In a section entitled "Review Process," the EOB noted a claimant's right to appeal any determination, and described the appeal process:

> If your claim is denied in whole or in part or if you disagree with the decision, you have a right to appeal the claim determination.
>
> This Plan maintains a two-level appeals process for post-service claims. You have 180 days from the date of this initial claim determination to file an appeal to the Claims Administrator. You can review documents relevant to the claim and submit written comments and evidence supporting your claim. You may appoint a provider or other person as your authorized representative by filing a written authorization with the Claims Administrator. Your appeal must be sent in writing to the Administrative Office and clearly explain that you are appealing a claim denial and the reason why you think the Claims Administrator should reconsider your claim.
>
> If still dissatisfied with the initial appeal level determination you have 90 calendar days from receipt of the first level determination to request a second level appeal review by writing to the Plan Administrator. Following an adverse benefit determination after both levels of review, you have a right to bring a civil action under ERISA Section 502(a).
>
> During the appeal process, the Claims Administrator and the Plan Administrator will conduct a full and fair review, consider all the evidence and exercise their fiduciary discretion to interpret the Plan and decide the appeal. They will consult with any appropriate health care professional in deciding an appeal involving medical judgment. The decision on review of your claim will state the specific reason for the

determination, reference the specific Plan provision upon which the decision was based and provide you with the right to request copies of all documents relevant to the review.

Vaught sent a letter to the Claims Administrator on January 22, 2004, stating that "[a]s per the plan agreement I am going to file an appeal within the 180 day time frame from the receipt of your claim denial," and designating the Rocco Law Firm as his representative for the appeal. The letter was stamped "RECEIVED" by the Claims Administrator on January 26, 2004.

On February 19, 2004, Joseph Rocco, an attorney with the Rocco Law Firm, sent a letter to the Claims Administrator explaining that his office represented the Vaughts, and that on their behalf (and pursuant to the Vaughts' January 22nd letter) his office was appealing the adverse determination of benefits under the plan. The letter listed seven grounds for the appeal:

1.   The specific reason or reasons for the adverse benefit determination have not been provided;

2.   References to the specific plan provisions on which the adverse benefit determination is based have not been provided;

3.   No description of additional material or information necessary to complete the claim has been requested;

4.   No description of the plan's appeal procedures, including applicable time limits, plus a statement of the right to bring suit under § 502 of ERISA with respect to any adverse benefit determination has been provided;

5.   No statement that the Vaughts are entitled to receive on request and free of charge, reasonable

access to and copies of all documents, records and other information relevant to the claim has been provided;

6.   No description of adverse benefit determination based upon an internal rule, guideline, protocol or similar criteria, if so based, has been provided;

7.   The sole description provided, "AM refer to the benefits booklet under exclusions and what the plan does not recover [sic] regarding motor vehicle related charges" is vague and ambiguous, fails to meet the requirements for a claim denial as outlined at page 37 of the "Flex Choice — Medical Benefit Summary Plan Description."

The letter was stamped "RECEIVED" by the Claims Administrator on February 24, 2004.

On March 16, 2004, Mitchell Melamed replied to Rocco regarding the February letter to the Claims Administrator.[1] In the letter, Melamed acknowledged receipt of Rocco's letter "requesting an appeal" of the adverse benefits determination, and explained that Vaught's claim was denied because the Plan does not cover "expenses incurred related to 'driving under the influence of alcohol or drugs.'" Apparently unaware that the Claims Administrator had already received Vaught's written authorization designating Rocco as his representative, Melamed asked Rocco to provide such authorization, adding "[i]f you have already forwarded that written authorization to the Plan, please forward a copy for my file." In response to Rocco's letter, Melamed stated that "[t]he spe-

---

[1]Melamed subsequently identified himself as an attorney representing the Plan, and therefore the Claims Administrator did not directly respond to Vaught's appeal, although the EOB indicated that the Claims Administrator was the decisionmaker for the first-level appeal. However, neither party places any weight on this procedural irregularity.

cific reason for denial of coverage is driving under the influence of alcohol or drugs, your client having an indicated blood alcohol level of 0.261." Melamed further advised that "[n]o additional material or information was necessary to complete the claim." Finally, Melamed stated that, "based on this apparently being the first formal notification, I would recommend that you now have 180 days within which to submit your appeal as set forth on page 37 of the Summary Plan Description."

On March 29, 2004, Rocco responded to Melamed by raising additional questions, and requesting a list of all documents reviewed by the Claims Administrator in order to reach its determination to deny coverage to Vaught because of his blood alcohol level, as well as copies of "any other documents or testimony of whatsoever kind" on which the Claims Administrator intended to rely. Instead of including a copy of Vaught's signed authorization, as Melamed requested in the March 16 letter, Rocco asked Melamed to confirm that the Plan had received Vaught's earlier authorization.

Melamed responded on April 28, 2004, noting that hospital records indicated that Vaught was driving with a blood alcohol level that was over three times the legal limit for Arizona. However, Melamed did not provide copies of the records or other documents on which the Claims Administrator was relying. Melamed sent subsequent letters to Rocco requesting a copy of Vaught's signed authorization.

On September 2, 2004, Randolph Bachrach (Vaught's attorney in the district court, and on appeal) sent a letter to the Plan Administrator, with copies to Melamed and the Claims Administrator, explaining that Vaught had retained Bachrach to appeal the denial of benefits. Bachrach stated that "Mr. Vaught appeals the denial of his claim, dated March 16, 2004," and requested copies of "all relevant claim and Plan documents" relating to the denial of benefits.

On September 14, 2004, Melamed replied to Bachrach in a letter which recited Melamed's understanding of the history of the denial of benefits. Melamed noted that Rocco had forwarded a letter to the Claims Administrator "stating in part that he was appealing the notice of declination of coverage and the basis of the alleged appeal." Melamed also recounted his repeated requests that Vaught provide a written authorization appointing a representative, and concluded that "[t]o the best of [Melamed's] knowledge, this was never done." Finally, Melamed concluded:

> The fact remains that the *Covered* Person [Raymond Vaught] or that Covered Person's authorized agent, being authorized in writing and sent to the Claims Administrator, has 180 days from the date of the original post-service denial to file an appeal to the Claims Administrator, and this has not been done. As a result, the original denial of benefits as set forth on the Explanation of Benefits must stand.

Bachrach replied on September 20, stating his "understanding of the Plan's position is that Mr. Vaught's appeal will not be accepted or acted upon for the reasons set forth in Mr. Melamed's letter," and that he assumes "the same to be true with respect to his request for claim and Plan documents."

Vaught filed a complaint in the United States District Court for the District of Arizona on March 7, 2005, alleging that the Plan had violated ERISA and the terms of the Plan in handling Vaught's claim. The complaint requested (1) Plan benefits, (2) penalties for non-disclosure of Plan documents under 29 U.S.C. § 1132(c)(1), and (3) attorney's fees and costs under 29 U.S.C. § 1132(g)(1). On July 27, 2005, the parties submitted a joint case management report, in which Vaught first raised his theory that his "injuries were not 'caused,' either directly or indirectly, by alcohol," and instead "were the direct result of and proximately caused by an automobile/ motorcycle collision." In the same report, the Plan contended

that this claim was unexhausted because Vaught had never explained to the Plan why the alcohol-related exclusion did not apply to him.

Recognizing that exhaustion could be a dispositive issue, the district court ordered both parties to brief whether Vaught had exhausted the Plan's appeal procedures, and whether failure to exhaust would preclude him from pursuing his claim in district court. In lieu of simply briefing the issue, however, the Plan filed a motion for summary judgment.

On January 23, 2006, the district court granted the Plan's motion for summary judgment on the ground that Vaught had failed to exhaust the Plan's internal remedies. The district court stated that Vaught's communications with the Claims Administrator and Melamed had failed "to administratively challenge Defendant's determination that the accident was a result of his driving under the influence." The court noted that Vaught raised his "first substantive challenge" to the Plan's determination in court. Because Vaught had not previously presented these arguments to the plan administrator, the court ruled that Vaught had failed to exhaust his administrative remedies, and could not raise his substantive challenges to the denial of benefits in federal court. Vaught timely appealed.

## II

We review the district court's grant of summary judgment de novo. Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 824 (9th Cir. 2000). "We also review de novo the district court's interpretation of an ERISA insurance policy's language." *Metro. Life Ins. Co. v. Parker*, 436 F.3d 1109, 1113 (9th Cir. 2006); *see also Welch v. UNUM Life Ins. Co. of Am.*, 382 F.3d 1078, 1082 (10th Cir. 2004) ("In interpreting the terms

of an ERISA plan[,] we examine the plan documents as a whole and, if unambiguous, we construe them as a matter of law." (Internal quotation marks omitted, alteration in original.)).

On appeal, Vaught contends that the district court erred in granting the Plan's summary judgment motion because Vaught had exhausted the Plan's administrative remedies and, alternatively, that he was excused from exhausting them.

### A

**[1]** ERISA itself does not require a participant or beneficiary to exhaust administrative remedies in order to bring an action under § 502 of ERISA, 29 U.S.C. § 1132. Section 502 allows an ERISA plan participant or beneficiary to bring an action in district court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." § 1132(a)(1)(B). However, based on both the text of ERISA and its legislative history, we long ago concluded that "federal courts have the authority to enforce the exhaustion requirement in suits under ERISA, and that as a matter of sound policy they should usually do so." *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980). Accordingly, we have consistently held that before bringing suit under § 502, an ERISA plaintiff claiming a denial of benefits "must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court." *Diaz v. United Agric. Employee Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995).

**[2]** We have also recognized exceptions to our prudential exhaustion requirement.[2] For example, we noted "that despite

---

[2]While recognizing exceptions to the exhaustion requirement, *Amato* and some of its progeny confusingly suggest that a district court lacks jurisdiction to review a plan's denial of benefits where the participant has

the usual applicability of the exhaustion requirement, there are occasions when a court is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not, the most familiar examples perhaps being when resort to the administrative route is futile or the remedy inadequate." *Amato*, 618 F.2d at 568 (internal quotation marks omitted); *see also Diaz*, 50 F.3d at 1483. Likewise, the current regulations implementing ERISA create an exception to the judge-made exhaustion requirement. Under 29 C.F.R. § 2560.503-1(*l*), where a plan fails to establish or follow "reasonable" claims procedures as required by ERISA, "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." *Cf. Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 981-82 & n.1 (9th Cir. 2005) (discussing the predecessor of current § 2560.503-1(*l*), which used the phrase "deemed denied"); *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 223 (2d Cir. 2006) (discussing § 2560.503-1(*l*)).

---

failed to exhaust the internal remedies. *See, e.g.*, *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 984 n.41 (9th Cir. 2001) (quoting *Amato*, 618 F.2d at 658); *White v. Jacobs Eng'g Group Long Term Disability Benefit Plan*, 896 F.2d 344, 352 (9th Cir. 1990); *Amato*, 618 F.2d at 566, 568. However, *Bowles v. Russell*, 127 S. Ct. 2360 (2007), clarified that court-promulgated rules are not jurisdictional: "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction." *Id.* at 2364 (internal quotation marks omitted) (alteration in original). Because *Bowles* supercedes our prior decisions, we must clarify that the exhaustion requirement set forth in *Amato* is not a jurisdictional requirement. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). We agree with the reasoning of our sister circuit in *Metropolitan Life Insurance Co. v. Price*, 501 F.3d 271 (3rd Cir. 2007), on this issue. *See id.* at 278-279; *see also Pension Benefit Guar. Corp. v. Carter & Tillery Enters.*, 133 F.3d 1183, 1187 (9th Cir. 1998) (recognizing that where Congress has not clearly required exhaustion, failure to follow such procedures does not create a jurisdictional bar).

B

**[3]** The parties disagree whether Vaught availed himself of the Plan's internal review procedures and thus exhausted his administrative remedies for purposes of bringing an action in district court. Under ERISA, an employee benefit plan's internal review procedures must be included in the plan's written documents, which include the plan instrument, *see* 29 U.S.C. § 1102(a)(1), and a summary of the plan instrument, called the "summary plan description." 29 U.S.C. § 1022. The summary plan description must be "written in a manner calculated to be understood by the average plan participant," and must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* § 1022(a). Among other things, the summary plan description must contain "the remedies available under the plan for the redress of claims which are denied in whole or in part." *Id.* § 1022(b).

**[4]** In this case, the Plan set forth the details of its internal review procedures in the EOB. The Plan's summary plan description, "FlexChoice Medical Benefit Summary Plan Description," stated that "a description of the plan's appeal procedures" would be included in the notices denying benefits (i.e., the EOBs). The summary plan description is part of the contract between the plan and the plan participants, *see Bergt v. Ret. Plan for Pilots Employed by Mark Air, Inc.*, 293 F.3d 1139, 1143 (9th Cir. 2002), which we interpret based on "contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (internal quotation marks omitted) (ellipsis in original). Based on general rules of contract interpretation, we interpret the Plan's summary plan description as incorporating the EOB's review procedures by reference. *See Parker*, 436 F.3d at 1115 ("We see nothing in ERISA that precludes incorporation by reference . . . ."); *see also Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 169-70 (3d Cir. 1999) (upholding

arbitrator's determination that an employee benefit plan incorporated by reference provisions of another written agreement). As a result, the EOB internal review procedures were part of the contract between the Plan and the participants and beneficiaries, and were therefore applicable to Vaught.

According to the EOB, a claimant must first file an appeal to the Claims Administrator. This first-level appeal must: (1) be made within 180 days of a claim denial; (2) be in writing; (3) "clearly explain" that it is an appeal; (4) "clearly explain . . . the reason why you think the Claims Administrator should reconsider your claim"; and (5) be authorized by the claimant in writing, if the claimant has appointed a representative to file the appeal. If dissatisfied with the Claims Administrator's "initial appeal level determination," the claimant may then request a second level appeal review by writing to the Plan Administrator. The claimant then has a right to bring a civil action under ERISA Section 502(a) if there is "an adverse benefit determination after both levels of review."

The parties do not dispute that Rocco's February 19, 2004 letter satisfies three of these five requirements: it was timely, in writing, and clearly explained that it was an appeal. Although Melamed previously took the position that Vaught had failed to file a written authorization to appoint a representative (the fifth requirement), the record establishes that Vaught did submit a written authorization to the Claims Administrator. The Plan did not rely on this rationale in the district court or on appeal, and therefore this fifth requirement is no longer in dispute.

Instead, the Plan contended before the district court, and now on appeal, that Vaught failed to exhaust administrative remedies because he did not discharge the fourth EOB requirement: Rocco's letter did not "clearly explain . . . the reason why you think the Claims Administrator should reconsider your claim." The Plan interprets this EOB language as requiring claimants to provide a substantive basis for their

appeals,—that is, to explain "why the initial determination was supposedly incorrect." Although Rocco's letter set forth seven procedural reasons why the Claims Administrator should reconsider Vaught's claim, the Plan contends that Vaught did not effectively invoke the Plan's internal review procedures as required by the EOB because he did not challenge the basis on which the Plan denied his claim or the Plan's interpretation of the relevant coverage exclusion. The district court accepted this interpretation of the EOB requirement, and agreed with the Plan that Vaught raised his "first substantive challenge" in the district court.

[5] We must consider this interpretation of the EOB in light of our principle that "terms in an ERISA plan should be interpreted in an ordinary and popular sense as would a [person] of average intelligence and experience." *Gilliam*, 488 F.3d at 1194 (internal quotation marks omitted) (alteration in original). Where a plan instrument does not define a term, we may "look to the dictionary definition to determine the ordinary and popular meaning." *Id.* at 1195. Here, the EOB's plain language does not support the Plan's interpretation of the EOB requirement that a claimant provide "the reason why" the Claims Administrator should reconsider the claimant's claim. We first note that the phrase "the reason why" is not defined in the Plan, and that we therefore must interpret it "in an ordinary and popular sense." The dictionary definition of the word "reason" includes any "explanation or justification of an act." Webster's New World College Dictionary 1194 (4th ed. 2005). A claimant asked to explain the "reason why" a decision should be reviewed could respond, consistent with this definition, that the decision was flawed by procedural errors. Such a response constitutes a reasonable "explanation or justification" of the claimant's request for reconsideration for several reasons. For example, a claimant may be entitled to relief if the plan's procedural errors were so significant that the plan's initial denial of benefits was simply arbitrary. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 973-74 (9th Cir. 2006) (en banc). A plan may also want the opportunity

to reconsider a procedurally flawed decision in order to correct its own procedural errors and avoid de novo review by the district court. *See id.* at 973 ("[I]f the plan administrator's procedural defalcations are flagrant, de novo review applies."); *see also Amato*, 618 F.2d at 568 ("[P]rior *fully considered* actions by pension plan trustees interpreting their plans . . . may well assist the courts when they are called upon to resolve the controversies." (Emphasis added.)). In sum, a person of "average intelligence and experience" could reasonably conclude that a claimant could explain "the reason why" the Claims Administrator should reconsider a claim by pointing to procedural errors.

**[6]** We conclude that the seven procedural reasons offered by Rocco in his initial letter to the Claims Administrator satisfied the EOB's requirement that the plan participant "clearly explain . . . the reason why you think the Claims Administrator should reconsider your claim." The Claims Administrator therefore erred in determining that Vaught had not effectively invoked the Plan's internal review procedures. Due to this mistake, the Plan erroneously declined to hear Vaught's appeal, and thus did not give Vaught an initial appeal-level determination. Instead, the Plan let the initial denial of benefits stand and made clear that it had completed its decision-making process. Because Vaught did not receive the initial appeal-level determination, he could not have requested a second-level review or have taken any further steps within the Plan to obtain further review of his claim; the original denial of benefits was the Plan's final decision.[3] Therefore, contrary to the Plan's argument that Vaught failed to avail himself of the Plan's internal review process, Vaught's initial assertion of procedural errors was sufficient to invoke this process and —because the Plan declined to hear his appeal—to exhaust his administrative remedies.

---

[3]In light of this conclusion, we need not consider whether § 2560.503-1(*l*) or an exception to *Amato*'s prudential exhaustion requirement is applicable. *Diaz*, 50 F.3d at 1483.

C

Our conclusion that Vaught exhausted his administrative remedies does not end our analysis, however, because the Plan also argues that Vaught failed to avail himself of the Plan's internal review procedures by failing to raise all his reasons for contesting the Plan's denial of benefits in his initial appeal. The Plan notes that Vaught's claim for benefits in district court was based on a legal theory (that his injuries were caused by a collision, not by alcohol) that was not raised in his initial letter to the Claims Administrator, or in any of the further correspondence with Melamed. The Plan argued, and the district court held, that Vaught's failure to identify this new theory to the plan administrator within the appeal time frame prevented him from bringing it before the district court.

The dissent similarly argues that Vaught failed to exhaust his administrative remedies because his initial letter of appeal failed to identify all his reasons for contesting the Plan's denial of benefits. Dis. Op. at 13880-81. The dissent bases this conclusion on the following analysis: As noted above, the EOB requires a plan participant filing a first-level appeal to "clearly explain . . . the reason why you think the Claims Administrator should reconsider your claim." According to the dissent, the EOB's use of the words "the reason" means that a plan participant must identify the main reason or reasons for the participant's challenge to the denial of benefits in the participant's initial appeal. Dis. Op. at 13879. In the dissent's view, a plan participant cannot raise a new reason for challenging a denial of benefits before the district court unless the court exercises its equitable discretion to "excuse compliance with the plan's requirement." Dis. Op. at 13879 n.10.

**[7]** Both the Plan and dissent seem to assume that the requirement they advocate (i.e., the requirement that a plan participant must raise all reasons for challenging a denial of benefits during the initial appeal process) is part of the long-

established duty under ERISA to exhaust administrative remedies. But this requirement is actually an issue exhaustion requirement, not a remedy-exhaustion requirement. In *Sims v. Apfel*, the Supreme Court explained the difference between the two: the requirement that a claimant "obtain a final decision on his claim" is a remedy-exhaustion requirement, while the requirement that a claimant must also "specify that issue in his request for review" by the agency is an issue-exhaustion requirement. 530 U.S. 103, 107 (2000). By arguing that Vaught not only needed to obtain the Plan's final decision on his claim that benefits were wrongfully denied (remedy exhaustion) but also needed to raise each of his specific theories or issues in his internal appeal to the Plan in order to obtain judicial review of those theories or issues, Dis. Op. at 13880-81, the dissent and Plan are effectively arguing that Vaught was subject to an issue-exhaustion requirement.

[8] In considering whether a district court may impose an issue-exhaustion requirement on an ERISA claimant, we are guided by the framework of analysis set forth by the Supreme Court. *See Sims*, 530 U.S. at 107-08. As explained in *Sims*, issue exhaustion is typically a creature of statute or agency regulation. For example, a statute may deprive a court of jurisdiction to hear specific issues or objections not raised before the agency. *Id.* at 107-08 (noting that "the Court of Appeals lacked jurisdiction to review objections not raised before the National Labor Relations Board" because "a statute provided that 'no objection that has not been urged before the Board . . . shall be considered by the court' ") (alterations in original)). An agency's regulations also require issue exhaustion in administrative appeals when they provide that a petition for review must " 'list the specific issues to be considered on appeal.' " *Id.* at 108 (quoting 20 C.F.R. § 802.211(a)). And, when regulations impose such a requirement, "courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues." *Id.*

**[9]** But neither issue-exhaustion situation identified in *Sims* is present here. No ERISA statute precludes courts from hearing objections not previously raised to the Plan, nor does any ERISA statute or regulation require claimants to identify all issues they wish to have considered on appeal. Nor has the Plan instituted issue exhaustion as a matter of contract. Instead of requiring claimants to "list the specific issues to be considered on appeal," *Sims*, 530 U.S. at 108 (internal quotation marks omitted), the Plan's appeal procedures on their face limit a claimant to a single reason: the EOB directs the claimant to provide "*the reason* why you think the Claims Administrator should reconsider your claim" (emphasis added).

In the absence of a statute or regulation, issue exhaustion may be required as "an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Id.* at 108-09. However, *Sims* noted that issue exhaustion is "not necessarily" a corollary of exhaustion of remedies and declined to require issue exhaustion in the Social Security Act context. *Id.* at 107-08. In a non-adversarial proceeding, "the reasons for a court to require issue exhaustion are much weaker." *Id.* at 110. A plurality of justices concluded that issue exhaustion was not appropriate because the Social Security agency proceedings were "inquisitorial rather than adversarial." *Id.* at 111. In a concurring opinion, Justice O'Connor noted that, "[i]n most cases, an issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court," but opined that it would be inappropriate to impose an issue-exhaustion requirement where the agency had failed to notify claimants of such a requirement. *Id.* at 112-14 (O'Connor, J., concurring). Because the Social Security Act regulations affirmatively suggested that issue exhaustion was not required, Justice O'Connor concluded that "[r]equiring issue exhaustion is particularly inappropriate here." *Id.* at 113.

**[10]** *Sims* leads to the conclusion that issue exhaustion is not applicable in the ERISA context. First, the internal review

process mandated by ERISA and set forth in the EOB provides for an inquisitorial process, in which the plan must provide the opportunity for "a full and fair review" of any claim denial. *See* 29 U.S.C. § 1133(2). While the ERISA statute and regulations do not explicitly describe these procedures as non-adversarial, we recognized in *Amato* that the institution of these review procedures "was apparently intended by Congress to," among other things, "provide a *nonadversarial* method of claims settlement." 618 F.2d at 567 (emphasis added).

ERISA's internal review procedures share the nonadversarial characteristics of the Social Security Act procedures. Both contemplate that a claimant's appeal will be heard by an impartial decisionmaker who may review new information in addition to information from the previous denial. *Compare* 29 C.F.R. § 2560.503-1(h)(iv) (requiring that an ERISA plan "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination"), *with* 20 C.F.R. §§ 404.900(b), 404.970(b) (describing the similarly expansive scope of the Social Security Act administrative review process). ERISA's regulations require an even less deferential appellate review of the initial denial of benefits than is required by the Social Security Act review process. *Compare* 29 C.F.R. § 2560.503-1(h)(3)(ii) (requiring that a plan's appeal procedures "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual"), *with* 20 C.F.R. § 404.970(a) (describing the Appeals Council's standards of review). Both schemes contemplate that many claimants will not be represented by attorneys, and neither requires claimants to provide formal briefing. *See Sims*, 530 U.S. at 112; *Cann v. Carpenters' Pension Trust Fund*, 989 F.2d 313,

317 (9th Cir. 1993) (noting that "some claimants and some plans may use informal internal review procedures, accomplished by nonlawyers, perhaps union or other employee representatives and plan representatives"). Most significant, neither scheme contemplates that the claimant will face an adversary opposing the claim for benefits in the review process. *See Sims*, 530 U.S. at 111 ("The Commissioner has no representative before the ALJ to oppose the claim for benefits, and we have found no indication that he opposes claimants before the Council."). To the extent issue exhaustion may be imposed as "an analogy to the rule that appellate courts will not consider arguments not raised before trial courts," *id.* at 108-09, such an analogy is even less apt in the ERISA context, because ERISA's "administrative" proceedings are "part of a private, albeit regulated, claims process." *See Cann*, 989 F.2d at 317. The non-adversarial nature of the ERISA proceeding weighs against imposing an issue-exhaustion requirement. *See Sims*, 530 U.S. at 109-10.

**[11]** The Plan's failure to notify claimants of any issue-exhaustion requirement also weighs against imposing one. *See id.* at 113 (O'Connor, J., concurring). Justice O'Connor's concern that Social Security claimants could be misled is equally applicable in this case, where the Plan's internal appeal procedures suggested that issue exhaustion was not required. The EOB directed claimants to use the Plan's internal review procedures in order to "have a right to bring a civil action under ERISA Section 502(a)," but did not provide notice that claimants must raise specific issues to preserve them for future actions. *See Sims*, 530 U.S. at 113. Similar to the Social Security requirements, the EOB provided for an informal appeal process in which decisionmakers would provide "a full and fair review, consider all the evidence and exercise their fiduciary discretion to interpret the Plan and decide the appeal." The EOB suggested that decisionmakers would further develop the record by consulting "any appropriate health care professional in deciding an appeal involving medical judgment." Because the EOB does not require issue exhaus-

tion, but rather suggests that a claimant need not raise all issues to the Plan in order to preserve them for further review, issue exhaustion would be particularly inappropriate in this case. *See Sims*, 530 U.S. at 113.[4]

**[12]** Because ERISA and its implementing regulations create an inquisitorial, rather than adversarial process, and because the EOB does not notify a claimant that issue exhaustion is required, *Sims* leads us to conclude that Vaught was not required to exhaust his issues or theories in the context of this case. *Accord Wolf v. Nat'l Shopmen Pension Fund*, 728 F.2d 182, 186 (3d Cir. 1984) ("Section 502(a) of ERISA does not require either issue or theory exhaustion; it requires *only* claim exhaustion."). Our conclusion here is consistent with our decision in *Smith v. Retirement Fund Trust*, 857 F.2d 587 (9th Cir. 1988), where we cited *Wolf* with approval in rejecting a plan's argument that a claimant did not exhaust available administrative remedies because he presented new evidence supporting his claim to the district court. *Id.* at 591-92. Here, as in *Sims*, Vaught exhausted his administrative remedies by requesting review of his claim denial and obtaining the Plan's final decision on his claim. His subsequent decision to raise a new issue before the district court did not retroactively erase his prior effective exhaustion of administrative remedies.

---

[4]*Sims* suggests that the analysis would be different if the Summary Plan Description or EOB required issue exhaustion at some stage in the administrative proceedings. 530 U.S. at 108 (noting that where agency regulations require issue exhaustion in administrative appeals, "courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues"). Moreover, such a requirement would put the claimant on notice of an issue-exhaustion requirement. *Id.* at 113 (O'Connor, J., concurring). We do not reach this issue, because we conclude that the summary plan description and EOB in this case do not contain an issue-exhaustion requirement.

D

We conclude that Vaught exhausted his administrative remedies and was not precluded from raising his new theory to the district court. The district court therefore erred in granting the Plan's summary judgment motion. Accordingly, we remand to the district court to review the plan administrator's decision to deny Vaught's claim for benefits. The district court should decide in the first instance whether allowing additional evidence outside the administrative record is appropriate in this case, and whether de novo or deferential review applies to the Plan's decision. *See Metropolitan Life Ins. Co. v. Glenn,* 128 S.Ct. 2343, 2351-52 (2008)*; Abatie*, 458 F.3d at 973.

III

Vaught also argues that the district court's summary judgment order improperly dismissed his claim against the Plan under § 502(c), 29 U.S.C. § 1132(c), for failure to disclose plan documents. Although the district court did not expressly address this issue in its order granting summary judgment, we affirm the district court's dismissal of Vaught's § 1132(c)(1) claim because the claim fails as a matter of law. *See, e.g.*, *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("We may affirm the district court on any basis supported by the record.").

Section 1132(c)(1) allows the district court to impose sanctions for a plan administrator's failure or refusal to comply with document requests. "Under 29 U.S.C. § 1132(c), only the plan 'administrator' can be held liable for failing to comply with the reporting and disclosure requirements." *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1234 (9th Cir. 2000). It is undisputed that Scottsdale Health Care Corporation is the "plan administrator." The Plan is not an "administrator" and therefore not a proper defendant under § 1132(c)(1). *See Cline*, 200 F.3d at 1234; *Moran v. Aetna*

*Life Ins. Co.*, 872 F.2d 296, 299-300 (9th Cir. 1989). Because Vaught brought his action against the Plan, not the plan administrator, his claim fails as a matter of law.

## IV

**[13]** In sum, we hold that Vaught exhausted the Plan's internal remedies and was not required to exhaust issues. Accordingly, we reverse the district court's grant of summary judgment to the Plan and remand for further proceedings. We affirm the district court's dismissal of Vaught's claim for penalties for nondisclosure of documents because the Plan is not the proper defendant under § 1132(c).

**Affirmed in part, reversed in part, and remanded.**

---

BEA, Circuit Judge, concurring in part and dissenting in part:

Raymond Vaught crashed his motorcycle into a stopped vehicle. Vaught was driving drunk, extremely so—his blood alcohol content was three times Arizona's legal limit. Vaught lived, but was hospitalized with serious injuries.[1] Unfortunately for Vaught, his ERISA health plan (the "Plan") contains an express exclusion of coverage for medical care expenses "relating to . . . [d]riving under the influence of alcohol or drugs" (the "DUI exclusion"). Accordingly, the Plan denied his claim, based on this DUI exclusion.

Vaught appealed the Plan's denial to the Plan's Claims Administrator. For such an appeal, the plain language of the Plan's internal review procedures required Vaught to state in his written appeal "the reason" he thought the Claims Administrator should reconsider the denial of coverage. In his written appeal, Vaught gave seven procedural reasons he claimed

---

[1]The driver of the car with which Vaught collided was not injured.

the Claims Administrator should reconsider its denial of coverage.[2] Not a single one of these seven reasons challenged the applicability of the DUI exclusion.

The Plan rejected Vaught's appeal, and he brought an action in district court. There, for the first time, he raised the cockamanie claim that the DUI exclusion did not apply because the collision, not the alcohol, caused his injuries. Because he had never presented *this* "reason" to the Plan, as was required by his policy, the district court found he had not satisfied the policy requirement that he present "*the* reason"

---

[2]The seven procedural reasons—lifted almost verbatim from 29 C.F.R. § 2560.503-1 with no earthly relation to the reality of Vaught's case and no support in the record—were:

1.  The specific reason or reasons for the adverse benefit determination have not been provided;

2.  References to the specific plan provisions on which the adverse benefit determination is based have not been provided;

3.  No description of additional material or information necessary to complete the claim has been requested;

4.  No description of the plan's appeal procedures, including applicable time limits, plus a statement of the right to bring suit under § 502 of ERISA with respect to any adverse benefit determination has been provided;

5.  No statement that the Vaughts are entitled to receive on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to the claim has been provided;

6.  No description of adverse benefit determination based upon an internal rule, guideline, protocol, or similar criteria, if so based, has been provided;

7.  The sole description provided, "AM refer to the benefits booklet under exclusions and what the plan does not recover [sic] regarding motor vehicle related charges" is vague and ambiguous, fails to meet the requirements for a claim denial as outlined at page 37 of the "Flex Choice — Medical Benefit Summary Plan Description."

he thought the denial of coverage was in error *first* to the Plan.

The majority reads the policy as requiring only that a claimant give the Administrator any old reason he thinks benefits should not have been denied, whether or not later abandoned. The majority transforms the Plan's requirement that Vaught state "the reason" he is challenging the denial of coverage into a requirement that can be satisfied if he states "a reason" or "any reason" for his challenge.

By transforming the Plan's review requirement in this manner, however, the majority allows an ERISA claimant to engage in a court-sanctioned game of Texas Hold 'Em against a Plan playing with all of its cards face up. An ERISA claimant challenging his plan's denial of coverage can keep his cards close during the administrative appeals process, rolling the throw-aways, and waiting until his action in district court and after the Plan Administrator has stopped playing, to play his trump card: the *real* reason he challenges his plan's denial of coverage. An action challenging an ERISA plan's denial of benefits, however, should not be a game of poker. Indeed, a primary purpose of the exhaustion requirement is to give an ERISA fiduciary the first opportunity to interpret its plan and fully to consider its determination before a claimant seeks court intervention.[3] Requiring an ERISA claimant to present to the ERISA fiduciary the reasons upon which he claims error for the Plan's denial of coverage—at least where, as here, the policy itself contains this express requirement—is critical to effectuate this purpose.

---

[3]*See Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980) ("[A] primary reason for the exhaustion requirement, here as elsewhere, is that prior fully considered actions by pension plan trustees interpreting their plans and perhaps also further refining and defining the problem in given cases, may well assist the courts when they are called upon to resolve the controversies.").

Vaught, whether deliberately or not, failed to comply with his plan's internal review procedures and failed to ask the district court to excuse him from that failure. Accordingly, I would affirm the district court's order dismissing Vaught's claim for failure to exhaust his administrative remedies.[4]

As the majority recognizes, Vaught was required first to exhaust his Plan's internal review procedures before challenging the denial of coverage in district court. *See Diaz v. United Agric. Employee Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995) ("Quite early in ERISA's history, we announced as the general rule governing ERISA claims that a claimant must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court."). When determining whether a party has exhausted his plan's internal review procedures, we look to the requirements of the plan's procedures and determine whether the party has complied with them. *See, e.g., Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 724 (9th Cir. 2000).

The parties dispute whether Vaught exhausted the Plan's internal review procedures. Thus, we are required to determine (1) what are the requirements of the Plan's review procedures, and (2) whether Vaught complied with them. Our task when determining this issue is a fairly straightforward one.

The majority correctly notes we "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995) (citation omitted). Our analysis of the Plan's requirements begins and ends with the Plan's plain language. Indeed, the language could not be any more plain: the Explanation of Benefits form ("EOB") states the claimant must, in writing,

---

[4]I concur in the majority's judgment affirming the dismissal of Vaught's claim for failure to disclose plan documents under 29 U.S.C. § 1132(c).

"*clearly explain* that you are appealing a claim denial and *the reason why you think* the Claims Administrator should reconsider your claim." (emphases added).

The "ordinary and popular sense" of the Plan's requirement the claimant "clearly explain . . . the reason why you think the Claims Administrator should reconsider your claim" is that the claimant is required to tell the Claims Administrator why its initial denial of coverage was in error. Such a requirement makes sense. ERISA "requires covered benefit plans to provide administrative remedies for persons whose claims for benefits have been denied." *Amato*, 618 F.2d at 567 (citing 29 U.S.C. § 1133). ERISA requires plans to afford a reasonable opportunity for a "full and fair review" by the ERISA fiduciary of the denial of benefits. 29 U.S.C. § 1133.[5] To be able to provide a full and fair review of the denial of Vaught's claim, the Plan quite reasonably required Vaught to state in his appeal the issue or issues upon which he claims error. By failing to tell the Plan the reason he *now* claims the Plan erred in denying his claim, however, Vaught thwarted the Plan's ability to provide such a review. In effect, he is "sandbagging" the Plan by submitting all sorts of "reasons," save the real reason he held close until filing his complaint.

The reason Vaught thinks the Plan erred in denying his claim is that the alcohol exclusion does not apply to him. Specifically, he contends the alcohol exclusion does not apply because his "injuries were not 'caused[,]' either directly or indirectly, by alcohol. Rather, [Vaught's] injuries were the direct result of and proximately caused by an automobile/ motorcycle collision."[6] Vaught, however, never *told* the

_____

[5]By imposing this requirement, Congress sought "to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Amato*, 618 F.2d at 567.

[6]This contention fails on the face of the policy. The policy does not exclude only expenses for injuries "proximately caused" by alcohol; it broadly excludes "all expenses incurred for services, supplies, medical care, or treatment relating to, arising out of, or given in connection with . . . [d]riving under the influence of alcohol or drugs."

Claims Administrator this was the reason it should reconsider his claim.

Vaught submitted two appeals of the Plan's denial. The first was his attorney's February 19, 2004 letter, which listed the seven grounds for the appeal noted at footnote 2, *supra*. The majority aptly describes these seven grounds as "procedural," since none of the grounds challenged the basis of the denial on the merits. Not a single one of the seven reasons gave the Plan notice that Vaught thought the alcohol exclusion did not apply to him, let alone inform the Plan the specific reason he thought the alcohol exclusion did not apply.

The Plan, through counsel, responded by letter on March 16, 2004. The letter spelled out again, in even clearer terms, the reason for the denial of Vaught's claim: the "Plan does not cover any expenses incurred related to 'driving under the influence of alcohol or drugs . . . . The specific reason for denial of coverage is driving under the influence of alcohol or drugs, your client having an indicated blood alcohol level of 0.261."[7] The Plan responded, point by point, to each of the seven procedural challenges Vaught raised in his September 2004 appeal.[8] Finally, the Plan, in an abundance of caution ("based on this apparently being the first formal notification"), gave Vaught *another* 180 days in which to file an appeal in accordance with the Plan's procedures.

Yet, Vaught missed his second chance to do so. Vaught's first attorney responded to the Plan's March 16, 2004 letter with a letter of his own on March 29, 2004, asking several questions[9] and requesting a list of documents the Plan Administra-

---

[7]Arizona state law proscribes driving with a blood alcohol content of 0.08 parts alcohol/blood. Ariz. Rev. Stat. § 28-1381(A)(2) (2003). Hence, Vaught was more than three times (300%) over the limit.

[8]The merits of the Plan's responses to Vaught's procedural contentions are not at issue on appeal, nor did Vaught challenge them in the district court.

[9]These included questions such as "whether the Plan would refuse to cover an individual driving under the 'influence' of drugs if the drugs

tor relied upon to reach its determination. The letter once again failed to state "the reason" Vaught thought the Plan erred in denying his claim ; i.e., the alcohol exclusion does not apply to Vaught because his injuries were "caused" by the collision, not alcohol.

On September 2, 2004, represented by new counsel, Vaught filed his second appeal of the denial of benefits. Yet again, he failed to state "the reason" why he now thinks the Claims Administrator should have reconsidered his claim. The September 2, 2004 letter states it is an appeal, requests all documents relevant to the denial, and notes that "ERISA provides for imposition of substantial monetary penalties for the failure of a Plan Administrator to make timely disclosures as required by law." Yet, nowhere in such appeal letter does Vaught's attorney state a single reason he thinks the Plan erred when it denied Vaught's claim. In neither of his appeals to the Plan did Vaught comply with the Plan's express requirement he state "the reason" the Claims Administrator should reconsider his claim. In neither of his appeals did he take issue with the Plan's determination the alcohol exclusion applied to him.

Vaught held his cards close until his action in district court. There, for the first time in the joint case management report, Vaught set forth the reason he thinks the Plan erred in denying benefits; i.e., the alcohol exclusion did not apply to him. By then, however, it was too late. He had failed to comply with the Plan's internal review procedures, and failed to give the Plan the opportunity to consider the merits of his challenge. Having failed to do so, he is barred from bringing an action challenging the denial of coverage on this basis. *See Diaz*, 50 F.3d at 1483.

were mis-prescribed by a Plan physician"—perhaps in preparation for that well-known DUI defense: "the bartender gave me the wrong drink!"—and how the Plan would prove Vaught received notice of the Plan's "driving under the influence" exclusion.

The majority, however, holds Vaught exhausted the Plan's internal review procedures because Vaught's February 19, 2004 appeal stated seven "procedural" reasons the Plan erred in denying coverage, although none of these purported procedural defects are related to the reason Vaught now challenges the denial, the applicability of the alcohol exclusion. In effect, the majority interprets the Plan's requirement to state "*the* reason why" the Claims Administrator should reconsider the claim as a requirement the claimant state "*a*" reason why or "*any*" reason why. According to the majority, once Vaught stated a reason—any reason—he "effectively invoked the Plan's internal review procedures." I respectfully disagree. Under no "ordinary and popular sense" of the term does "the reason" mean "a reason" or "any reason." *See The Random House Dictionary of the English Language* 1965 (2d ed. 1987) (the: "used, esp. before a noun, with a specifying or particularizing effect, as opposed to the indefinite or generalizing force of the indefinite article *a* or *an*.").

The majority goes wrong in its definition of "the reason" by concentrating on the noun to the exclusion of the restrictive article. "The reason" does not include *any* "explanation or justification." It may be a claimant has more than one reason for appealing the Plan's decision, and I do not interpret the Plan's requirement to limit a claimant to a singular reason to the exclusion of all other legitimate reasons.[10] But when requiring

---

[10]Indeed, if an ERISA plan attempted to limit a claimant to presentation of a singular reason for his appeal although the claimant may have multiple legitimate reasons, I have no doubt a court would excuse compliance with the plan's requirement and permit the claimant to raise the additional reasons in district court. *See Amato*, 618 F.2d at 568 (stating a district court would abuse its discretion if it failed to excuse exhaustion where "resort to the administrative route is futile or the remedy inadequate."). Nor could a plan require a claimant to state any and all reasons in the initial appeal, on pain of never being able to raise other reasons before the district court, no matter what equitable grounds there may be for failure to comply with the requirement. *See id.* The point is that, where possible, the Plan must be given the *first* opportunity to consider the errors a plaintiff claims, before the district court gets involved.

"*the reason*," the ordinary and popular meaning is certainly to include the main reason on which one relies. If there are two or more equally important, or at least substantial, reasons, they should be presented to the Claims Administrator, so the Plan has the first opportunity to evaluate, accept, or reject the contentions. "The reason" certainly does *not* mean "any reason but not necessarily the reason on which I intend to rely in court."

If one were to recur to the "purpose" of the provision requiring the insured to state the reason he thinks the Plan's denial erroneous, it clearly is to allow the Claims Administrator first to consider the basis upon which the insured claims he was improperly denied his claim. Exhaustion of the claimed bases of error should precede judicial action. Otherwise, we destroy the purpose of exhaustion and allow plaintiff to play bait and switch. Plaintiff could have laid out as a "reason" that the right to payment is a right guaranteed him as a right retained by the People under the Ninth Amendment to the United States Constitution. That would be "a" or "any reason." But that would not engage the Claims Administrator to consider plaintiff's novel interpretation of the DUI exclusion: damages due to drinking are excluded only in the case of alcohol-induced cirrhosis of the liver, but not when the wasted motorcyclist wipes himself out.

It may be that a plan requirement that the claimant state the reason he challenges a benefit denial is unfair in certain circumstances; where, for example, the reason develops during the appeals process and the claimant could not have raised the reason earlier. If "the reason," or reasons, a plaintiff claims in court that he was erroneously denied benefits was not put before the Claims Administrator, and there are equitable grounds for excusing that failure, the district must consider those equitable grounds. In such a circumstance, the district court may exercise its discretion to excuse the claimant from the exhaustion requirement. *See Amato*, 618 F.2d at 568 ("[T]here are occasions when a court is obliged to exercise its

jurisdiction and is guilty of an abuse of discretion if it does not, the most familiar examples perhaps being when resort to the administrative route is futile or the remedy inadequate.") (citation omitted).

This, however, is not such a case. Vaught never asked the district court to excuse his failure to raise in his administrative appeal the reason he now claims the Plan erred when it denied coverage based on the DUI exclusion. Had Vaught presented some evidence to the district court that he could not have challenged the applicability of the DUI exclusion in his initial appeal to the Claims Administrator, this might be a different case.[11] He did not, nor did he request the district court excuse him from the exhaustion requirement for any other reason.

Accordingly, I would hold that Vaught failed to exhaust his plan's remedies, because he failed to comply with the Plan's requirement he state "the reason" he thinks the Claims Administrator should have reconsidered his claim, namely, the alcohol exclusion did not apply to him.[12] Thus, I would affirm the district court's dismissal of Vaught's claim challenging the Plan's denial of benefits, and I dissent from the majority's opinion reversing and remanding that claim.

---

[11]It may be that Vaught's novel interpretation of the DUI exclusion clause had not occurred to him and his attorney until just before filing his district court action, because neither had achieved another 0.2618 blood alcohol level since the accident. However, I doubt that would be an acceptable reason for his earlier failure.

[12]Because we should affirm the dismissal for failure to exhaust the Plan's internal review procedures, we should not reach the novel issue whether the judicially-created ERISA exhaustion requirement includes an "issue exhaustion" requirement independent of the requirements of a particular plan's internal review procedures.